IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ANTOINE DWAYNE FRAZIER,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS**<br><br>Case No. 4:19-cr-00141-DN<br><br>District Judge David Nuffer |

Defendant Antoine Dwayne Frazier has moved to suppress evidence that was discovered and seized during the stop, detention, and search of his vehicle by Utah Highway Patrol Trooper Adam Gibbs ("Trooper Gibbs") on November 12, 2019 (the "Motion").[1] Frazier alleges in the Motion that (1) Trooper Gibbs lacked reasonable suspicion to stop the vehicle for a moving traffic violation; (2) the detention of Frazier exceeded that which the Fourth Amendment authorizes for traffic violations; and (3) Trooper Gibbs lacked probable cause to search the vehicle.[2]

However, because (1) Trooper Gibbs had reasonable suspicion to stop Frazier's vehicle for several observed traffic violations; (2) the detention of Frazier did not exceed that which is legally authorized under the circumstances; and (3) Trooper Gibbs had probable cause to search Frazier's vehicle based upon a trained canine's alert, the Motion is DENIED.

The excellent work by counsel in the hearing and in submissions are greatly appreciated, and have eliminated the need for oral argument.

---

[1] Motion to Suppress, docket no. 13, filed Jan. 28, 2020.

[2] *Id.*

PROCEDURAL HISTORY...................................................................................................... 2
FINDINGS OF FACT............................................................................................................. 3
CONCLUSIONS OF LAW .................................................................................................. 18
    I.     The Traffic Stop Was Justified from Its Inception. ............................................. 18
           A.     Standard of Review..................................................................................... 18
           B.     Trooper Gibbs Had Reasonable Suspicion to Stop the Vehicle After
                 Observing Several Traffic Violations. ....................................................... 19
    II.    The Scope and Duration of the Traffic Stop was Reasonably Related to the
          Circumstances Justifying the Stop. ...................................................................... 21
           A.     Trooper Gibbs Diligently Pursued the Tasks Reasonably Associated with
                 the Traffic Stop. ......................................................................................... 23
           B.     While Diligently Pursuing the Tasks Associated with the Traffic Stop,
                 Trooper Gibbs Developed Reasonable Suspicion that Frazier was Involved
                 in Other Criminal Activity. ........................................................................ 26
    III.   Probable Cause Existed to Search Frazier's Vehicle. .......................................... 35
ORDER.................................................................................................................................. 37

## PROCEDURAL HISTORY

On December 19, 2019, Defendant was charged by Indictment with Possession of Fentanyl with Intent to Distribute, Possession of Cocaine with Intent to Distribute, and Possession of a Firearm in Furtherance of a Drug Trafficking Crime.[3] Defendant filed the Motion on January 28, 2020.[4] An evidentiary hearing was held on March 4, 2020.[5] Based on the Motion, the government's submission after the hearing,[6] the defense submission thereafter,[7] and the facts presented at the evidentiary hearing, the court enters the following findings of fact:

---

[3] Indictment, docket no. 1, filed Dec. 19, 2019.

[4] Motion, docket no. 13.

[5] Minute entry for proceedings held before Judge David Nuffer, docket no. 20.

[6] United States' Response to Motion to Suppress, docket no. 27, filed April 13, 2020.

[7] Notice of Filing Proposed Memorandum Decision and Order, docket no. 30, filed May 20, 2020.

## FINDINGS OF FACT

### Background on Trooper Gibbs

Trooper Gibbs has been a Utah Highway Patrol Trooper since 2012.[8]  Trooper Gibbs has received specialized interdiction training, including a three-day national training in 2016 and numerous other specialized workshops.[9] Trooper Gibbs' primary responsibility is traffic enforcement in Iron County, but he is a member of an interdiction team specializing in enforcement and interdiction projects in other areas.[10]  Trooper Gibbs described interdiction work as attempting to find major crimes on the highway.[11]  Trooper Gibbs is trained to look for reactions to his presence, along with different indicators and small differences when conducting traffic stops, which may not be apparent to someone who lacks his training and experience.[12]  Trooper Gibbs averages approximately 1,000 traffic stops a year for the Utah Highway Patrol, and spends most of his shift patrolling Interstate 15.[13]  Trooper Gibbs' training and experience has taught him that drugs typically flow north and east from the southwest area of the United States, and then money works its way south and west.[14]  Because a traffic stop is a high-risk encounter, Trooper Gibbs is trained to look for small details to not only look for criminal activity but to also ensure his safety.[15]

---

[8] Transcript of Motion to Suppress Hearing ("Tr.") 6:19-21, docket no. 23, dated March 4, 2020.

[9] Tr. 7:11-20.

[10] Tr. 8:9-16; 14:21-25.

[11] Tr. 9:6-7.

[12] Tr. 9:14-25; 10:1-2.

[13] Tr. 11:4-8; 11:23-25 – 12:1.

[14] Tr. 11:16-20.

[15] Tr. 13:9-23.

**November 12, 2019 – Trooper Gibbs Sees Frazier's Vehicle**

Trooper Gibbs was on duty on November 12, 2019, at approximately 9:00 a.m., sitting stationary in his patrol vehicle at approximately mile marker 63 on Interstate 15 in Iron County, parked in the median watching northbound traffic.[16] Trooper Gibbs was talking on the phone[17] when he observed a white sport utility vehicle with Kansas license plates pass his location traveling northbound which appeared to be exceeding the speed limit, visually estimating the vehicle to be traveling at approximately 85 miles per hour.[18] The speed limit at that section of Interstate 15 is 80 miles per hour, and that speed limit is posted about a quarter mile prior to where Trooper Gibbs was parked in the median.[19] He also was able to observe that the driver was African American and the vehicle had an out-of-state license plate.[20] Trooper Gibbs pulled out onto the highway to follow the vehicle, directly behind it in the right lane, and he paced the vehicle traveling at approximately 85 miles per hour.[21] As he followed, Trooper Gibbs also had a radar confirmation that the vehicle was traveling at 85 miles per hour.[22] The speed that he was traveling as he paced the vehicle for approximately two miles is also captured on Trooper Gibbs' dash camera, which showed that his speed of travel stayed between 84 and 88 miles per hour.[23]

---

[16] Tr. 14:1-20.

[17] Tr. 99:20-22.

[18] Tr. 15:5-19.

[19] Tr. 16:8-19.

[20] Tr. 100:13-22.

[21] Tr. 16:1-3.

[22] Tr. 17:16-19; 18:9-11.

[23] Tr. 19:9-25; Tr. 52:5-23; Government's Exhibit 1, Trooper Gibbs Dash Cam Video, docket no. 22, filed March 4, 2020 ("Gov. Exhibit 1") at 9:05:30 – 9:06:29.

As both the vehicle and Trooper Gibbs traveled in the right lane, they approached slower moving traffic, so Trooper Gibbs changed lanes to the left lane.[24] The vehicle he was following also changed lanes in front of him, from the right to the left lane, after only signaling for a total of three blinks, and for less than two seconds before beginning the lane change.[25] That lane change did not interfere with the trooper's travel or speed.[26] Trooper Gibbs continued to follow the vehicle, observed it pass a slower moving vehicle on the right, and then the vehicle made another lane change from the left to the right lane, while again signaling for less than two seconds prior to making the lane change.[27] That lane change also did not impair the travel of the other vehicles.[28] Trooper Gibbs observed both signal violations and counted that the vehicle's signal was on for less than two seconds prior to making the lane changes,[29] by utilizing his standard manner of counting seconds.[30]

### The Stop

After observing the two signal violations while the vehicle was still speeding, Trooper Gibbs ran a records check on the license plate to verify that the vehicle was not stolen, informed dispatch of the impending traffic stop, pulled behind the vehicle and turned on his overhead emergency lights to conduct a traffic stop at approximately 9:06 a.m.[31] Prior to making the stop, the trooper was informed that the vehicle was not stolen.[32] The driver of the vehicle promptly

---

[24] Tr. 20:8-10.

[25] Tr. 20:5-15; 21:1-9; 53:11-21; Gov. Exhibit 1 at 9:05:44.

[26] Tr. 103: 9-25.

[27] Tr. 21:12-25; 22:1-4; Gov. Exhibit 1 at 9:06:11.

[28] Tr. 103: 3-4

[29] Tr. 141:6-17.

[30] Tr. 22:11-23.

[31] Tr. 23:3-25; 24:13-14; Gov. Exhibit 1 at 9:06:29.

[32] Tr. 119: 7-8.

pulled over to the shoulder of Interstate 15 northbound at approximately mile marker 67, less than a minute after the overhead lights were activated.[33] At approximately 9:07, Trooper Gibbs pulled in behind the vehicle and made a passenger side approach, making observations into the vehicle's windows.[34] Trooper Gibbs observed that the driver had his phone playing a video next to the steering wheel.[35] Trooper Gibbs observed a duffle bag in the back cargo area that appeared to be new, along with what appeared to be another smaller bag.[36] These are bags that are sold commercially.[37] Similar bags are commonly used by interstate travelers and more often than not do not contain drugs.[38]  Trooper Gibbs has found large loads of narcotics where there has just been one duffle bag sitting in the back, either in the trunk or cargo area.[39]

Trooper Gibbs made contact with the driver from the front passenger side of the vehicle, but the driver only rolled down the window approximately three to four inches.[40] When Trooper Gibbs asked the driver to roll the window down further, the driver rolled it down an inch further.[41] The driver was the only occupant of the vehicle.[42] Trooper Gibbs observed there was a small container of air freshener or scent deodorizer in the center console.[43] He could not smell

---

[33] Tr. 24:6-10; 24:23-25; Gov. Exhibit 1 at 9:06:34.

[34] Tr. 25:11-13; Gov. Exhibit 1 at 9:07:00; Government's Exhibit 2, Trooper Gibbs Body Cam Video, docket no. 22, filed March 4, 2020 ("Gov. Exhibit 2") at 9:07:00.

[35] Tr. 29:19-22.

[36] Tr. 25:15-17; 27:1-7; 105:4-9.

[37] Tr. 110: 1-2.

[38] Tr. 106: 4-12.

[39] Tr. 27:11-23; 105:10-13.

[40] Tr. 28:2-3; Gov. Exhibit 2 at 9:07:10-9:07:15.

[41] Tr. 28:3-5.

[42] Tr. 28:10-14.

[43] Tr. 28:6-7; 113:1-16.

the deodorizer or any odor of drugs.[44] He also noticed that the contents of the vehicle, including food wrappers and drink containers, were consistent with interstate travel.[45] Based on the driver's willingness to only roll the window down a few inches, and the presence of the deodorizer, Trooper Gibbs believed that the driver was trying to hide odors from the vehicle, such as marijuana or alcohol.[46]

Trooper Gibbs began to communicate with the driver, and asked for his driver's license.[47] The driver handed Trooper Gibbs an Iowa driver's license, and Trooper Gibbs observed that there was what appeared to be a Missouri driver's license in his wallet.[48] When Trooper Gibbs asked about that, the driver showed him that it was a Missouri identification card.[49] The name, date of birth and other identifying information were the same on both documents.[50] The presence of the two pieces of identification did not raise any suspicion with the trooper.[51] The driver was identified at that time as Antoine Dwayne Frazier, the defendant).

Trooper Gibbs told Frazier he had been stopped for traveling 5 miles per hour over the speed limit and for failing to signal for a full two seconds before changing lanes.[52] Upon learning that, Frazier appeared to look frustrated.[53] After he had received Frazier's driver's license,

---

[44] Tr. 115:25-116:1-4.

[45] Tr. 112:1-18.

[46] Tr. 28:22-25; 29:1-7.

[47] Tr. 29:8-12.

[48] Tr. 29:13-16; Government's Exhibit 3, Identification Documents for Antoine Dwayne Frazier, docket no. 22, filed March 4, 2020 ("Gov. Exhibit 3").

[49] Tr. 29:16-19; 31:9-25.

[50] Tr. 29: 12-19.

[51] Tr 32: 13-16.

[52] Tr. 30: 17-21.

[53] Tr. 30: 22-24.

Trooper Gibbs asked for registration and insurance for the vehicle.[54] Frazier opened the glove box and handed Trooper Gibbs the registration, which showed that it was a rental vehicle.[55] Trooper Gibbs asked Frazier if it was a rental, and he replied that it was, so Trooper Gibbs asked for the rental agreement.[56] Frazier looked confused and started looking all over in the vehicle, including in the visor and in the center console, for the rental agreement.[57]

While Frazier was looking for the rental agreement, Trooper Gibbs looked around the vehicle, and saw a bottle on the front seat that looked like a beer bottle.[58] Frazier handed it to Trooper Gibbs, telling him that it was ginger beer with no alcohol in it, which Trooper Gibbs confirmed.[59] While Frazier continued to look for the rental agreement, Trooper Gibbs looked in the cargo area and back seat again, and confirmed that there were two bags in the cargo area.[60] Trooper Gibbs again observed a deodorizer in the center console, but could not smell it.[61] In his experience, Trooper Gibbs has found there to be air fresheners or deodorizers in vehicles where drugs are located, sometimes even spray deodorants. In Trooper Gibbs' experience, when drugs that give off odors are in a vehicle, the odor could be constantly present.[62] In those situations,

---

[54] Tr. 32:17-20.

[55] Tr. 32:23-25.

[56] Tr. 34:23-25.

[57] Tr. 35:1-3.

[58] Tr. 35:4-12.

[59] Tr. 35:13-15.

[60] Tr. 35:19-25; 36:1.

[61] Tr. 36:10-14; 114:1-8.

[62] Tr. 115: 5-9.

Trooper Gibbs has seen people use air fresheners are used to mask the odor of the drugs.[63]

Trooper Gibbs did not detect the odor of air freshener or deodorizer[64], or the odor of drugs.[65]

      While Frazier was looking for the rental agreement on his phone,[66] Trooper Gibbs engaged him in conversation, asking him where he was coming from, and after a short pause, Frazier said he was at his sister's house.[67] Trooper Gibbs acknowledged that when multitasking, some people will hesitate before responding to a question.[68] Frazier then showed Trooper Gibbs a phone number on his cell phone for the rental company by holding up his phone for Trooper Gibbs to see the phone number.[69]  Frazier was never able to produce a rental agreement for Trooper Gibbs, only the phone number for the rental company.[70]

      Trooper Gibbs asked Frazier if he would come back to his vehicle so they could make contact with the rental company together, but Frazier declined.[71] Frazier started to call the rental company, but Trooper Gibbs said he would get the number from him and make the call back at his vehicle, so that he could verify who he was actually talking to.[72] Before Trooper Gibbs returned to his vehicle to make that call, he pulled out his notepad to write down some information he needed, such as phone numbers, and Frazier's social security number for the citation, and while doing so, he continued to engage in conversation with Frazier.[73] When asked

---

[63] Tr. 115: 10-16.

[64] Tr. 36: 13-14.

[65] Tr. 116: 3-4.

[66] Tr. 119:21-25; 120:1-5.

[67] Tr. 37:1-6.

[68] Tr. 121: 12-15.

[69] Tr. 37:6-15.

[70] Tr. 42:12-25.

[71] Tr. 37:18-20.

[72] Tr. 37:22-25.

[73] Tr. 38:7-20.

how long he was at his sister's, Frazier asked Trooper Gibbs why he was asking these questions, to which Trooper Gibbs responded that he asked these types of travel questions on all of his traffic stops.[74] Frazier told Trooper Gibbs that he was in Los Angeles.[75] When asked if he lived in Missouri or Iowa, since he had identification from both states, Frazier said he spends time in both places.[76]

Trooper Gibbs asks the same four questions on every traffic stop—where the individual is coming from, where they are going, how long they were on their trip, and how they know other individuals in the vehicle.[77] He asks these questions to make conversation, but also learn about travel plans that are short turnaround trips, which may indicate some sort of criminal activity.[78] Trooper Gibbs believed that Frazier was being deceitful in his answers by the way he was answering the questions, by pausing before answering two questions and answering one question with a question, all of which led Trooper Gibbs to believe that Frazier was trying to come up the right answer but not necessarily the simple, correct answer.[79] Hesitation in answering questions about travel raised suspicion because Trooper Gibbs' training and experience has taught him that people engaged in drug trafficking hesitate to disclose specifics about their travel to protect information about sources and the destination of drugs.[80] When

---

[74] Tr. 38:13-17; 122:17-24.

[75] Tr. 38:20.

[76] Tr. 41:6-13.

[77] Tr. 39:14-23.

[78] Tr. 39:24-25; 40:1-12.

[79] Tr. 38:22-25; 39:1; 125:7-126:10; 131:10-14.

[80] Tr. 135:10-23; 136:1-15.

someone is getting a speeding citation, they will generally answer really quick when asked where they are coming from, without having to think about it.[81]

### Trooper Gibbs Calls for Canine Handler

At approximately 9:11 a.m., Trooper Gibbs returned to his patrol vehicle, while Frazier remained in his vehicle.[82] Once he returned to his vehicle, Trooper Gibbs did not initially engage in the standard procedures involved in a traffic stop.[83] He attempted to make contact with a canine handler, Iron County Sheriff's Deputy Peterson, first via instant messaging from his patrol vehicle.[84] Trooper Gibbs believed that Deputy Peterson would still be nearby and in his vehicle to access an instant message, because he had helped Trooper Gibbs on a stop just twenty minutes prior, and Deputy Peterson was the only canine handler on duty at the time.[85] After Trooper Gibbs sent Deputy Peterson a couple messages, without a response, he tried to call him on the radio several times.[86] Trooper Gibbs still did not get a response, so he asked dispatch to get hold of Deputy Peterson.[87]

As he waited for Deputy Peterson to reply to the dispatcher, Trooper Gibbs pulled up the citation form on his laptop, and began to fill out the driver and vehicle information on the citation.[88] At approximately 9:14 a.m., Deputy Peterson called Trooper Gibbs on the phone and Trooper Gibbs asked him to respond to his location at mile marker 67 northbound, and Deputy

---

[81] Tr. 40:13-20.

[82] Tr. 44:2-4; 55:11-12; Gov. Exhibit 1 at 9:11:05; Gov. Exhibit 2 at 9:11:05.

[83] Tr. 130: 21-131:22.

[84] Tr. 41:1-5; 55:13-17; 89:5-14; 133:17-23; Gov. Exhibit 2 at 9:11:30.

[85] Tr. 43:10-21; 57:1.

[86] Tr. 57:5-12.

[87] Tr. 57:12-14.

[88] Tr. 57:16-23; Tr. 89:16-19.

Peterson replied that he was en route.[89] Trooper Gibbs continued working on the citation and routine traffic stop activities, reviewing the Iowa driver's license, verifying the license plate record for the citation, providing the driver's information to dispatch to request a records check at approximately 9:18.[90] It is routine when conducting traffic stops for Trooper Gibbs to radio dispatch for a driver's license check, as well as a warrant and criminal history check.[91]

At approximately 9:19 a.m., while waiting for dispatch to return the requested information, but before contacting the car rental company, Trooper Gibbs pulled up DEASIL on his computer, a DEA license plate identification and locating system, to run the vehicle's license plate through that system.[92] Trooper Gibbs was utilizing DEASIL to verify the travel plans that Frazier had provided, which is standard procedure if he is suspicious of criminal activity.[93] Trooper Gibbs learned that the vehicle had passed through Kansas westbound on Interstate 70, on November 9, 2019, at approximately 7:46 a.m.[94] This information raised additional suspicion because Frazier said he had gone to Los Angeles, and it would be a lengthy trip to go from Kansas to Los Angeles and back to the present location in that amount of time.[95] The quick-turnaround trip to Los Angeles and back was suspicious, because the route and the behavior is consistent with drug trafficking, based on Trooper Gibbs' interdiction training and experience.[96]

---

[89] Tr. 58:6-10; Tr. 90:13-19; Gov. Exhibit 2 at 9:14:46.

[90] Tr. 58:17-22; 59:21-25; 91:3-20; 92:1-7; Gov. Exhibit 2 at 9:18:07 to 9:18:46.

[91] Tr. 60:1-9.

[92] Tr. 60:14-18; 129:17-23. DEASIL is an online investigative tool that captures photos of license plates passing through locations with timestamps, to assist law enforcement to find stolen vehicles, identify vehicle locations, and verify travel histories provided by drivers. Tr. 61:1-15; Tr. 92:8-12.

[93] Tr. 60:16-18; 61:16-19.

[94] Tr. 60:18-21.

[95] Tr. 62:2-13.

[96] Tr. 62:9-13; 63:1-18; 64:1-6.

At approximately 9:21 a.m., Trooper Gibbs called the rental company on the phone number provided by Frazier, in order to verify that Frazier was authorized to have the vehicle.[97] Trooper Gibbs spoke to a representative at the rental company and verified that Frazier was authorized to have the rental since October 14, and it was not overdue.[98] The phone call with the rental company lasted for approximately two minutes.[99]

### Trooper Peterson Arrives

At approximately 9:22 a.m., while Trooper Gibbs was on the phone with the rental company representative in his patrol vehicle, Deputy Peterson arrived at his location and made contact with Frazier seated in his vehicle.[100] Deputy Peterson had traveled from the Iron County Sheriff's Office in Cedar City to the scene, taking approximately ten minutes to arrive at Trooper Gibbs' location.[101] After Deputy Peterson arrived at his location, Trooper Gibbs ended the phone call with the rental company.[102]

While still seated in his patrol vehicle, Trooper Gibbs observed Deputy Peterson have Frazier step out of his vehicle and conduct a pat-down of Frazier at approximately 9:23 a.m.,[103] so that he could have his canine conduct a free air sniff of the vehicle.[104] Trooper Gibbs observed that Deputy Peterson missed a knife on the initial pat-down, so Trooper Gibbs leaned out his window to alert him about the knife in his left pocket.[105] Deputy Peterson removed the knife, and

---

[97] Tr. 64:22-25; 65:1-10; Gov. Exhibit 2 at 9:20:50.

[98] Tr. 65:17-23.

[99] Gov. Exhibit 1 at 9:20:50 – 9:23:08; Gov. Exhibit 2 at 9:20:50 - 9:23:08.

[100] Tr. 66:13-17; 67:10-15; 93:2-15; Gov. Exhibit 1 at 9:22:20.

[101] Tr. 160:16-23; 162:20-24.

[102] Tr. 68:3-7; Gov. Exhibit 1 at 9:23:08.

[103] Gov. Exhibit 1 at 9:23:17.

[104] Tr. 66:16-21; 67:20-23; 93:18-25; 163:2-16.

[105] Tr. 66:21-24.

Trooper Gibbs continued to observe Frazier, who stood on the side of the highway about 20 yards from his vehicle.[106] While continuing to watch Frazier as Deputy Peterson did his job, Trooper Gibbs continued his work on the citation.[107]

Deputy Peterson has been an Iron County Sheriff's Deputy for eight years, and has been a trained canine handler for more than five years, after completing the first of two eight-week canine academies with two different canines.[108] Deputy Peterson is certified as a canine instructor with his second canine, Bolos, who was certified as a narcotics detector dog in the spring of 2016, and has been re-certified each year as required.[109] Bolos' most recent certification, which was active at the time of Frazier's traffic stop, was issued on March 29, 2019.[110] Bolos is trained to detect methamphetamine, heroin, cocaine, and marijuana.[111]

### Canine Sniff

During the deployment of Bolos on Frazier's vehicle, Deputy Peterson and Bolos conducted the "free-air sniff" of the vehicle in the same manner as they were trained.[112]  It was approximately 44 degrees outside with a slight wind at two miles per hour.[113] Bolos made three passes around the vehicle in both directions, clockwise and then counterclockwise, consistent

---

[106] Tr. 69:18-25; 70:1-5.

[107] Tr. 70:11-17.

[108] Tr. 150:17-21; 151:21-24; 152:15-17.

[109] Tr. 153:15-24.

[110] Tr. 157:4-25; 158:1-2; Government's Exhibit 6, Certification Record for K-9 Bolos, docket no. 22, filed March 4, 2020.

[111] Tr. 156:8-10.

[112] Tr. 164:16-19.

[113] Tr. 161:13-14.

with his training.[114] Bolos is a "passive indicator," meaning that he usually freezes, stops, and stares when he detects narcotics.[115]

Deputy Peterson began deploying Bolos around Frazier's vehicle at approximately 9:24 a.m.[116] While Deputy Peterson was deploying Bolos, Trooper Gibbs was filling out the citation, waiting for the records check from dispatch to return, and watching Frazier to make sure he didn't make any furtive movements or attack Deputy Peterson.[117] While Bolos was being deployed, Trooper Gibbs observed that Frazier appeared nervous about what Deputy Peterson was doing.[118] During the duration of the canine deployment, Trooper Gibbs' primary focus was on watching Frazier standing on the side of the highway, to ensure officer safety while Deputy Peterson had his back to Frazier.[119]

Bolos alerted on the back of the vehicle by going up on it and sniffing around, but Bolos' provided a more pronounced alert at the driver's side door, pressing so hard on the door seam that it left some blood from Bolos' old wound on the door.[120] Trooper Gibbs remained in his patrol vehicle during the canine deployment, and when complete, Deputy Peterson came to Trooper Gibbs' vehicle at approximately 9:26 a.m. to verbally notify him that Bolos had alerted to narcotics in the vehicle, at the "driver's door."[121] Shortly after Deputy Peterson told Trooper

---

[114] Tr. 158:9-25; 165:1-10; 166:15-25.

[115] Tr. 159:13-24.

[116] Gov. Exhibit 1 at 9:24:40.

[117] Tr. 70:23-25; Tr. 71:1-16.

[118] Tr. 71:21-25.

[119] Tr. 95:2-12.

[120] Tr. 165:11-25; 166:12-25; 167:1-6; 168:14-21.

[121] Tr. 73:8-22; Tr. 96:8-15; 169:18-24; Gov. Exhibit 2 at 9:26:45.

Gibbs that the canine had alerted on the vehicle, dispatch came on the radio and stated that they had the records check back on Frazier.[122]

### Search of Frazier and Vehicle

Trooper Gibbs told dispatch to go ahead with the results, and at approximately 9:27 a.m., dispatch told Trooper Gibbs that Frazier did not have any criminal history since 2006, nothing drug-related, but he had been charged with murder and pled to manslaughter.[123] Trooper Gibbs decided to approach Frazier with more caution and have him wait in the back of his patrol vehicle while they conducted the vehicle search.[124]

Both Trooper Gibbs and Deputy Peterson approached Frazier, who was still standing on the side of the highway, and told him that they would be searching his vehicle and why, and that they would also be placing him in the patrol vehicle during the search.[125] As Frazier started to get into the back of the patrol vehicle, Deputy Peterson said he wanted to pat him down one more time to confirm there were no weapons.[126]

At approximately 9:28 a.m., Deputy Peterson began to conduct the pat down and immediately felt a gun in Frazier's left front pants pocket, which was removed without incident at approximately 9:29 a.m.[127] Frazier was handcuffed and placed under arrest.[128]  At 9:32 a.m., dispatch advised Trooper Gibbs that the firearm was stolen.[129]

---

[122] Tr. 74:13-25; 75:1-6; Gov. Exhibit 2 at 9:26:55.

[123] Tr. 75:19-25; 76:1; Gov. Exhibit 2 at 9:26:55-9:27:36 [dispatch also notified Trooper Gibbs that the Defendant had served seven years for involuntary manslaughter].

[124] Tr. 76:10-23.

[125] Tr. 77: 3-20; 171:12-24.

[126] Tr. 78:24-25; 79:1; 171:18-24.

[127] Tr. 79:2-8; 80:1-12; 172:2-8; Gov. Exhibit 2 at 9:29:00.

[128] Tr. 81:6-18; Gov. Exhibit 1 at 9:29:00.

[129] Tr. 82:3-5; 97:1-4; Gov. Exhibit 2 at 9:32:20.

Trooper Gibbs and Deputy Peterson began to search Frazier's vehicle at approximately 9:32 a.m.[130] Trooper Gibbs started on the passenger side of the vehicle while Deputy Peterson began searching the bags in the cargo area.[131] After Trooper Gibbs did not find anything of concern in the passenger areas, he went to the cargo area to observe Deputy Peterson's search of the bags in the cargo area, where narcotics are located at approximately 9:33 a.m.[132] Deputy Peterson located a large package of pills that were suspected to be oxycodone or counterfeit fentanyl pills.[133] Deputy Peterson then located a brick that was suspected to be approximately a kilogram of cocaine, inside a grocery bag in a backpack located in the cargo area of the vehicle.[134]

After the drugs were located in the initial search, the vehicle was moved to the Utah Highway Patrol Office in Cedar City for a more detailed search.[135] Also located in the bags in the cargo area were some vacuum-sealed bags and dryer sheets, which are used to package drugs and conceal odors.[136] Trooper Gibbs follows Utah Department of Public Safety Policies 516 (Search and Seizure) and 704 (Vehicle Towing and Release), on his traffic stops to the extent that they apply.[137]

---

[130] Gov. Exhibit 1 at 9:32:55.

[131] Tr. 83:9-20.

[132] Tr. 97:9-11; Gov. Exhibit 2 at 9:33:55.

[133] Tr. 84:9-23

[134] Tr. 85:1-9.

[135] Tr. 86:18-24.

[136] Tr. 85:12-20.

[137] Tr. 88: 2-3; Government's Exhibit 4, filed March 4, 2020; Government's Exhibit 5, filed March 4, 2020.

## CONCLUSIONS OF LAW

I.   **The Traffic Stop Was Justified from Its Inception.**

   A.   **Standard of Review**

A routine traffic stop is an investigative detention governed by the principles of *Terry v. Ohio*.[138] "[A] traffic stop is reasonable if it is (1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place."[139] A stop is "valid under the Fourth Amendment if [it] is based on an observed traffic violation."[140] "Reasonable suspicion is 'a particularized and objective basis' for suspecting the person stopped of criminal activity."[141] "Reasonable suspicion is a less demanding standard than probable cause" because it can be established with information that is different in quantity or content than that required to establish probable cause," and can "arise from information that is less reliable than that required to show probable cause."[142] "*Terry* demands suspicion not certainty."[143]

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop."[144] Indeed, "as long as [the officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, [the officer] may initiate an investigatory detention even if it is more likely than *not* that the individual is not involved in any

---

[138] *Terry v. Ohio*, 392 U.S. 1 (1968); *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015); *United States v. McGehee*, 672 F.3d 860, 866 (10th Cir. 2012).

[139] *United States v. Karam*, 496 F.3d 1157, 1161(10th Cir. 2007) (internal quotation marks omitted).

[140] *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc).

[141] *United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) (citation omitted).

[142] *United States v. Tuter*, 240 F.3d 1292, 1296 n.2 (10th Cir. 2001).

[143] *United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012).

[144] *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (citation omitted).

illegality."[145]  When an individual actually violated the law is irrelevant.[146] A traffic stop based

on an officer's incorrect but reasonable assessment of the facts does not violate the Fourth

Amendment."[147]  Rather, the relevant inquiry is "whether [the officer] had reasonable suspicion

of a violation, not whether there was actually a violation."[148] The government bears the burden

of proving the reasonableness of the officer's suspicion that a motorist violated a traffic

regulation.[149]

> **B.**     **Trooper Gibbs Had Reasonable Suspicion to Stop the Vehicle After Observing Several Traffic Violations.**

The stop of Frazier's vehicle was justified because Trooper Gibbs observed the vehicle

speeding, in violation of Utah Code Annotated Sections 41-6a-601 and 41-6a-602, which

provides that a person may not operate a vehicle at a speed greater than is reasonable and prudent

under the existing conditions, and any speed in excess of the posted limit is prima facie evidence

that the speed is unlawful.[150]

Trooper Gibbs observed Frazier's vehicle pass his location traveling northbound on

Interstate 15, and he visually estimated the vehicle to be traveling at approximately 85 miles per

hour.[151] The speed limit at that section of Interstate 15 is 80 miles per hour, and that speed limit

---

[145] *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) (emphasis in original).

[146] *United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (holding officer had reasonable suspicion to stop vehicle for a windshield violation and noting that it was "irrelevant whether the observed crack was, in fact, large enough to constitute a violation of law")

[147] *Tibbetts*, 396 F.3d at 1138 (citation omitted).

[148] *Id.* at 1137.

[149] *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007).

[150] Utah Code Ann. § 41-6a-601; Utah Code Ann. § 41-6a-602.

[151] Tr. 15:5-19.

is posted about a quarter mile prior to where Trooper Gibbs was parked stationary in the median.[152]

Trooper Gibbs followed the vehicle, directly behind it in the right lane, and paced the vehicle traveling at approximately 85 miles per hour,[153] also confirmed by radar.[154] The speed that he was traveling as he paced the vehicle for approximately two miles is captured on Trooper Gibbs' dash camera, which showed that his speed stayed between 84 and 88 miles per hour.[155] Based on those observations, Trooper Gibbs formed reasonable suspicion that Frazier was committing a traffic infraction, speeding in excess of the posted speed limit, in violation of the Utah Code.

Additionally, while Trooper Gibbs was observing the vehicle speeding, Trooper Gibbs also observed that Frazier failed to properly signal before making a lane change on two separate occasions. Section 41-6a-804 of the Utah Code Annotated requires:

> (1)(a)   A person may not turn a vehicle or move right or left on a roadway or change lanes until:
>> (i) the movement can be made with reasonable safety; and
>> (ii) an appropriate signal has been given as provided under this section.
>  (b)   A signal of intention to turn right or left or to change lanes shall be given continuously for at least the last *two seconds preceding the beginning of the movement*.[156]

As both Frazier and Trooper Gibbs traveled in the right lane with Trooper Gibbs following, Trooper Gibbs changed lanes to the left lane and Frazier's vehicle also changed lanes in front of him, from the right to the left lane, after only signaling for a total of three blinks, and

---

[152] Tr. 16:8-19.

[153] Tr. 16:1-3.

[154] Tr. 17:16-19; 18:9-11.

[155] Tr. 19:9-25; Tr. 52:5-23; docket no. 22. Gov. Exhibit 1 at 9:05:30 – 9:06:29.

[156] Utah Code Ann. § 41-6a-804 (emphasis added).

for less than two seconds before beginning the lane change.[157] Trooper Gibbs continued to follow Frazier's vehicle, and then he observed Frazier's vehicle make another lane change back to the right lane while again signaling for less than two seconds prior to making the lane change from the left to the right lane.[158]

After observing the two signal violations and the speed violation, Trooper Gibbs turned on his overhead emergency lights to conduct a traffic stop at approximately 9:06 a.m.[159] Frazier pulled over to the shoulder of Interstate 15 less than a minute later.[160]

When reviewing a reasonable suspicion determination, courts examine the totality of the circumstances to determine whether an officer has a particularized and objective basis for suspecting wrongdoing.[161] "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude the untrained person.'"[162] Based on the observed traffic violations, Trooper Gibbs had reasonable suspicion to conduct a routine traffic stop of Frazier's vehicle.

## II.     The Scope and Duration of the Traffic Stop was Reasonably Related to the Circumstances Justifying the Stop.

Conduct of a routine traffic stop is also governed by *Terry* principles.[163]  A lawful stop justifies a detention sufficient in scope and duration to investigate the suspected violation that

---

[157] Tr. 20:5-15; 21:1-9; 53:11-21; Gov. Exhibit 1 at 9:05:44.

[158] Tr. 21:12-25; 22:1-4; Gov. Exhibit 1 at 9:06:11.

[159] Tr. 23:3-25; 24:13-14; Gov. Exhibit 1 at 9:06:29.

[160] Tr. 24:6-10; 24:23-25; Gov. Exhibit 1 at 9:06:34.

[161] *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotations and citations omitted).

[162] *Id.* (citation omitted).

[163] *Rodriguez,* 575 U.S. at 354; *McGehee*, 672 F.3d at 866.

warranted the stop.[164] Authority for the seizure does not end until "tasks tied to the traffic infraction are – or reasonably should have been – completed."[165]

An officer conducting a traffic stop may perform a range of investigatory inquiries, subject to the overarching rule that the stop does not "unreasonably infringe [] interests protected by the Constitution."[166] These include driver's license, registration, and proof of insurance checks.[167] A rental agreement establishes authority to operate a vehicle.[168] Additionally, because "[t]raffic stops are especially fraught with danger," officers may make "negligibly burdensome" inquiries to complete the mission safely.[169] Thus, a motorist may be detained for a short period while the officer checks for "outstanding warrants or criminal history . . . even though the purpose of the stop had nothing to do with such prior criminal history."[170]

During a stop, officers may conduct a canine sniff without probable cause or reasonable suspicion, if it does not prolong the time reasonably required to complete the mission of the stop.[171] The longer the officer takes to complete these routine traffic-stop steps, the longer the

---

[164] *Rodriguez,* 575 U.S. at 354.

[165] *Id.* at 354.

[166] *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *see also United States v. Holt*, 264 F.3d 1216, 1221 (10th Cir. 2001) (en banc) (noting officer may perform actions reasonable necessary to investigate and resolve the violation), *abrogated on other grounds as stated in United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007).

[167] *Rodriguez*, 575 U.S. at 355; *see also Holt*, 264 F.3d at 1221 (noting during a routine traffic stop an officer may investigate whether driver's license and registration are valid to establish driver's "authority to operate the vehicle").

[168] *United States v. $49,000.00 in U.S. Currency, More or Less*, 208 F. App'x 651, 654 (10th Cir. 2006) (unpublished) (stating officer making a lawful stop of a motorist may detain driver and check license, registration or rental agreement); *United States v. Shareef*, 100 F.3d 1491, 1508 (10th Cir. 1996) (noting that in officers' investigation into driver's authority to operate vehicle, "[i]t was inevitable that officers would request the rental agreements").

[169] *Rodriguez*, 575 U.S. 356.

[170] *Holt*, 264 F.3d at 1221; *see also United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996) ("Triple I checks are run largely to protect the officer.")

[171] *Rodriguez*, 575 U.S. at 350-51 (citing *Caballes*, 543 U.S. at 407); *see also United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990) (holding dog sniff not a search under the Fourth Amendment and "therefore an individualized reasonable suspicion of drug-related criminal activity" is not required when dog employed during lawful seizure of vehicle); *U.S. v. Mayville*, 955 F.3d 825, 833 (10th Cir. 2020) ("Because the dog sniff and alert

detention lasts. Yet the stop remains reasonable so long as the officer has performed his tasks with reasonable diligence and in an amount of time "reasonably needed to effectuate" the law-enforcement purpose of the stop.[172]

In *Sharpe*, the Court rejected a "*per se* rule that a 20-minute detention is too long to be justified" in the context of a vehicle stop based on reasonable suspicion, explaining that a stopwatch approach is "clearly and fundamentally at odds with our approach in this area."[173] The Court explained that the duration of a temporary seizure must be reasonable under the circumstances and that it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."[174] The Court cautioned, however, that courts should not "second-guess[]" police officers' decisions by "imagin[ing] some alternative means by which" they could have accomplished their objectives more quickly.[175]

### A.   Trooper Gibbs Diligently Pursued the Tasks Reasonably Associated with the Traffic Stop.

The purpose of the stop had not been completed when Bolos alerted to narcotics in Frazier's vehicle. Trooper Gibbs initiated the traffic stop at approximately 9:06 a.m.[176] Approximately twenty minutes had elapsed when Trooper Gibbs was notified that Bolos had alerted on the vehicle at approximately 9:26 a.m.[177] During that entire time period, Trooper

---

were contemporaneous with the troopers' reasonably diligent pursuit of the stop's mission, the subsequent search of Defendant's vehicle and discovery of evidence did not violate his Fourth Amendment rights.")

[172] *United States v. Sharpe*, 470 U.S. 675, 685-86 (1985).

[173] 470 U.S. at 686.

[174] *Id.*

[175] *Id.* at 686-87.

[176] Tr. 23:3-25; 24:13-14; Gov. Exhibit 1 at 9:06:29.

[177] Tr. 73:8-22; Gov. Exhibit 2 at 9:26:45.

Gibbs was preparing the citation, while diligently requesting license, warrants, and criminal history checks. He also took steps to verify Frazier's authority to operate the vehicle by calling the rental car company phone number that was provided by Frazier. Trooper Gibbs was performing actions reasonably necessary to resolve the violations, one of which is establishing the driver's authority to operate the vehicle.[178] A valid rental agreement establishes such authority.[179] Trooper Gibbs was on the phone with the rental car company when Deputy Peterson arrived to deploy Bolos. The entire deployment of Bolos took less than two minutes, beginning at 9:24 a.m.,[180] and Trooper Gibbs was notified of the alert at 9:26 a.m.[181]

At the time Trooper Gibbs was notified of Bolos' alert, he had not received the results of the records requests from dispatch, which he received at approximately 9:27 a.m.[182] It was reasonable for Trooper Gibbs to wait for a criminal history check because many officers are shot during routine traffic stops, so warrant and history "checks are run largely to protect the officer."[183] It was only *after* Deputy Peterson told Trooper Gibbs of Bolos' alert that dispatch communicated Frazier's criminal history that included an arrest for murder, and a conviction for involuntary manslaughter. Accordingly, the canine sniff did not prolong the time reasonably required to complete the mission of the stop, and in turn, provided probable cause to search the vehicle.[184]

---

[178] *Holt,* 264 F.3d at 1221.

[179] *Shareef*, 100 F.3d at 1508.

[180] Gov. Exhibit 1 at 9:24:40.

[181] Tr. 73:8-22; Gov. Exhibit 2 at 9:26:45.

[182] Tr. 75:19-25; 76:1: Gov. Exhibit 2 at 9:26:55-9:27:36.

[183] *McRae,* 81 F.3d at 1535 n.6. *McRae* used the term "Triple I check" which refers to a check of the Interstate Information Index. Triple I check. *Mayville*, 955 F.3d at 828.

[184] *United States v. Bates,* 453 F. App'x 839, 843 (10th Cir. 2012) (unpublished) (citing *United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009)).

Trooper Gibbs was under no obligation to call dispatch any earlier as he conducted his duties related to the stop. He was obliged to "diligently pursue[] a means of investigation that was likely to confirm or dispel [his] suspicion quickly."[185] In doing so, no "per se rule" governs the order of tasks or length of stop.[186] And reviewing courts should not "second-guess[]" police officers' decisions by "imagin[ing] some alternative means by which" they could have accomplished their objectives more quickly.[187]

At the time that Bolos alerted on the vehicle, when the stop transitioned to a probable cause search of the vehicle, Trooper Gibbs had not yet completed the routine tasks associated with the traffic stop. He was still working on the citation and dispatch had not yet returned the results of a criminal history check, when Deputy Peterson notified Trooper Gibbs that Bolos had alerted.  Because tasks tied to the infractions and to the safe completion of the mission of the original stop were not yet completed, Trooper Gibbs' authority for the seizure had yet not ended when Bolos alerted on Frazier's vehicle.

The United States Supreme Court found no Fourth Amendment violation under similar circumstances in *Illinois v. Caballes*,[188] and the Tenth Circuit likewise found no Fourth Amendment violation under similar circumstances in *U.S. v. Mayville*.[189]

---

[185] *Sharpe*, 470 U.S. at 686.

[186] *United States v. Brigham,* 382 F.3d 500, 511 (5th Cir. 2004) (en banc); *see also United States v. Hernandez*, 418 F. 3d 1206, 1212 n.7 (11th Cir. 2005) ("We underline that the police are not constitutionally required to move at top speed or as fast as possible.")

[187] *Sharpe,* 470 U.S. at 686-87.

[188] 543 U.S. 405, 407 (2005).

[189] *Mayville*, 955 F.3d at 833.

B.   **While Diligently Pursuing the Tasks Associated with the Traffic Stop, Trooper Gibbs Developed Reasonable Suspicion that Frazier was Involved in Other Criminal Activity.**

From the beginning of his contact with Frazier, and as he worked through the tasks associated with a routine traffic stop, Trooper Gibbs developed reasonable suspicion that Frazier might be involved in criminal activity, which provided authority to extend the duration and scope of the stop if necessary. Beginning at approximately 9:07 a.m., Trooper Gibbs made a passenger side approach to Frazier's vehicle, and began to make observations into the windows as he approached.[190] Trooper Gibbs observed a duffle bag in the back cargo area that appeared to be new, along with what appeared to be another smaller bag.[191] Trooper Gibbs then made contact with Frazier from the front passenger side of the vehicle, but Frazier would only roll down the window approximately three to four inches.[192] When Trooper Gibbs asked him to roll the window down further, he rolled it down only an inch further.[193] Trooper Gibbs observed there was a small container of air freshener or scent deodorizer in the center console.[194]  Based on Frazier's willingness to only roll the window down a few inches, coupled with the presence of the deodorizer, Trooper Gibbs believed that Frazier was trying to hide odors from the vehicle, such as marijuana or alcohol.[195]

Frazier handed to Trooper Gibbs an Iowa driver's license, but when he handed it to him, Trooper Gibbs observed what appeared to be a Missouri driver's license in Frazier's wallet.[196]

---

[190] Tr. 25:11-13; Gov. Exhibit 1 at 9:07:00; docket no. 22. Gov. Exhibit 2, filed March 4, 2020 (hereinafter "Gov. Exhibit 2") at 9:07:00.

[191] Tr. 25:15-17; 27:1-7; 105:4-9.

[192] Tr. 28:2-3; Gov. Exhibit 2 at 9:07:10-9:07:15.

[193] Tr. 28:3-5.

[194] Tr. 28:6-7; 113:1-16.

[195] Tr. 28:22-25; 29:1-7.

[196] Tr. 29:13-16; docket no. 22 Gov. Exhibit 3, filed March 4, 2020.

When Trooper Gibbs asked about that, Frazier showed him that it was just his Missouri identification card.[197] Trooper Gibbs asked for registration and insurance for the vehicle.[198] Frazier opened the glove box and handed Trooper Gibbs the registration, which showed that it was a rental vehicle.[199] Trooper Gibbs asked for the rental agreement.[200] Frazier looked all over in the vehicle for the rental agreement.[201]

As Frazier looked for the rental agreement, Trooper Gibbs engaged him in conversation, asking him where he was coming from, and after a short pause, Frazier said he was at his sister's house.[202] Frazier then showed Trooper Gibbs a phone number on his cell phone for the rental company by holding up his phone for Trooper Gibbs to see.[203] The registration indicated that the vehicle was a rental, but Frazier was never able to produce a rental agreement for Trooper Gibbs, only the phone number for the rental company.[204]

Frazier did not want to do go with Trooper Gibbs to his patrol vehicle to call the rental company,[205] so Trooper Gibbs told him that he would just get the number from him and make the call back at his vehicle, so that he could verify that is who he was actually talking to.[206] Before Trooper Gibbs returned to his vehicle to make that call, he pulled out his notepad to write down some information he needed, such as phone numbers, and Frazier's social security number

---

[197] Tr. 29:16-19; 31:9-25.

[198] Tr. 32:17-20.

[199] Tr. 32:23-25.

[200] Tr. 34:23-25.

[201] Tr. 35:1-3.

[202] Tr. 37:1-6.

[203] Tr. 37:6-15.

[204] Tr. 42:12-25.

[205] Tr. 37:18-20.

[206] Tr. 37:22-25.

for the citation, and while doing so, he continued to engage in conversation with Frazier.[207] When asked how long he was at his sister's, Frazier asked the Trooper why he was asking these questions, to which Trooper Gibbs responded that he asked these types of travel questions on all of his traffic stops.[208] Frazier told Trooper Gibbs that he was in Los Angeles.[209] When asked if he lived in Missouri or Iowa, since he had identification from both states, Frazier said he spends time in both places.[210]

Trooper Gibbs asks the same four questions on every traffic stop—where individuals are coming from, where they are going, how long they were on their trip, and how they know other individuals in the vehicle.[211] He asks these questions to make conversation, but also to learn about travel plans that are short turnaround trips which may indicate some sort of criminal activity.[212] Trooper Gibbs believed that Frazier was being deceitful in his answers by the way he was answering the questions by pausing, answering a question with a question, indicating that he was trying to come up the right answer but not necessarily the simple, correct answer.[213]

Frazier's hesitation in answering questions about his travel raised suspicion based upon Trooper Gibbs' training and experience, because people engaged in drug trafficking hesitate to disclose specifics about their travel to protect information about sources and the destination of drugs.[214] At that point, Trooper Gibbs' suspicion was raised that there was something in the

---

[207] Tr. 38:7-20.

[208] Tr. 38:13-17; 122:17-24.

[209] Tr. 38:20.

[210] Tr. 41:6-13.

[211] Tr. 39:14-23.

[212] Tr. 39:24-25; 40:1-12.

[213] Tr. 38:22-25; 39:1; 125:7-15.

[214] Tr. 135:10-23; 136:1-15.

vehicle that Frazier did not want located or that he was involved in criminal activity, based upon not having a rental agreement, the duffle bag in the cargo area, the deceitful answers he believed he was getting, Frazier not wanting to roll down his window, and the deodorizer he observed.[215]

Trooper Gibbs returned to his patrol vehicle, while Frazier remained in his vehicle, at approximately 9:11 a.m.[216] Once he returned to his vehicle, based on his suspicion that Frazier was possibly involved in the trafficking of narcotics, Trooper Gibbs attempted to make contact with a canine handler, Iron County Sheriff's Deputy Peterson, first via instant messaging from his patrol vehicle.[217] After Trooper Gibbs sent Deputy Peterson a couple messages, without a response, he tried to call him on the radio several times.[218] Trooper Gibbs still did not get a response, so he asked dispatch to get hold of Deputy Peterson.[219] Each of these attempts to contact Deputy Peterson were done while Trooper Gibbs was engaged in other duties related to a routine traffic stop.

While waiting for Deputy Peterson to reply, Trooper Gibbs pulled up the citation form on his laptop, and began to fill out the driver and vehicle information on the citation.[220] At approximately 9:14 a.m., Deputy Peterson responded to Trooper Gibbs on the phone, and advised that he was en route.[221] Trooper Gibbs continued working on the citation and routine traffic stop activities, reviewing the Iowa driver's license, verifying the license plate record for the citation, and provided the driver's information to dispatch to request a records check at

---

[215] Tr. 39:2-13; 56:4-7; 134:8-18 [the Defendant's unwillingness to roll the window down indicated he was trying to cover up odors].

[216] Tr. 44:2-4; 55:11-12; Gov. Exhibit 1 at 9:11:05; Gov. Exhibit 2 at 9:11:05.

[217] Tr. 41:1-5; 55:13-17; 89:5-14; 133:17-23; Gov. Exhibit 2 at 9:11:30.

[218] Tr. 57:5-12.

[219] Tr. 57:12-14.

[220] Tr. 57:16-23; Tr. 89:16-19.

[221] Tr. 58:6-10; Tr. 90:13-19; Gov. Exhibit 2 at 9:14:46.

approximately 9:18.[222] It is routine when conducting traffic stops for Trooper Gibbs to radio dispatch for a driver's license check, as well as a warrant and criminal history check.[223]

At approximately 9:19 a.m., while waiting for dispatch to return the requested information, Trooper Gibbs pulled up DEASIL on his computer, a DEA license plate identification and locating system.[224] Trooper Gibbs utilized DEASIL to verify the travel plans that Frazier had provided, which is standard procedure if he is suspicious of criminal activity.[225] Trooper Gibbs learned that the vehicle had passed through Kansas westbound on Interstate 70, on November 9, 2019, at approximately 7:46 a.m.[226] The quick-turnaround trip to Los Angeles and back was suspicious to Trooper Gibbs, because the route and the behavior is consistent with drug trafficking, based on his interdiction training and experience.[227]

At approximately 9:21 a.m., Trooper Gibbs called the rental company to verify that Frazier was authorized to have the vehicle.[228] Trooper Gibbs spoke to a representative at the rental company and was able to verify that Frazier was authorized to have the rental and it was not overdue.[229] The phone call with the rental company lasted for approximately two minutes.[230]

At approximately 9:22 a.m., and while Trooper Gibbs was on the phone with the rental company representative in his patrol vehicle, Deputy Peterson arrived at his location and made

---

[222] Tr. 58:17-22; 59:21-25; 91:3-20; 92:1-7; Gov. Exhibit 2 at 9:18:07 to 9:18:46.

[223] Tr. 60:1-9.

[224] Tr. 60:14-18; 129:17-23. DEASIL is an online investigative tool that captures photos of license plates passing through locations with timestamps, to assist law enforcement to find stolen vehicles, identify vehicle locations, and verify travel histories provided by drivers. Tr. 61:1-15; Tr. 92:8-12.

[225] Tr. 60:16-18; 61:16-19.

[226] Tr. 60:18-21.

[227] Tr. 62:9-13; 63:1-18; 64:1-6.

[228] Tr. 64:22-25; 65:1-10; Gov. Exhibit 2 at 9:20:50.

[229] Tr. 65:17-23.

[230] Gov. Exhibit 1 at 9:20:50 – 9:23:08; Gov. Exhibit 2 at 9:20:50 - 9:23:08.

contact with Frazier.[231] Shortly after Deputy Peterson arrived, Trooper Gibbs ended the phone call with the rental company.[232] While still in his patrol vehicle, Trooper Gibbs observed Deputy Peterson have Frazier step out of his vehicle and conduct a quick pat-down of Frazier at approximately 9:23 a.m.,[233] so that he could have his canine conduct a free air sniff of the vehicle.[234] Trooper Gibbs observed that Deputy Peterson missed a knife on the initial pat-down so he leaned out the window to alert him about the knife in his left pocket.[235] Deputy Peterson removed the knife, and Trooper Gibbs observed Frazier, who stood on the side of the road about 20 yards from his vehicle.[236]

Deputy Peterson began deploying his canine around Frazier's vehicle at approximately 9:24 a.m.[237] While Deputy Peterson was deploying his canine, Trooper Gibbs was filling out the citation, waiting for the records check from dispatch to return, and watching Frazier to make sure he didn't make any furtive movements or attack Deputy Peterson.[238]  While the canine was being deployed, Trooper Gibbs observed that Frazier appeared nervous about what Deputy Peterson was doing.[239]

Deputy Peterson came to Trooper Gibbs' vehicle at approximately 9:26 a.m. to verbally notify him that the canine had alerted to narcotics in the vehicle, at the "driver's door."[240] Shortly

---

[231] Tr. 66:13-17; 67:10-15; 93:2-15; Gov. Exhibit 1 at 9:22:20.

[232] Tr. 68:3-7; Gov. Exhibit 1 at 9:23:08.

[233] Gov. Exhibit 1 at 9:23:17.

[234] Tr. 66:16-21; 67:20-23; 93:18-25; 163:2-16.

[235] Tr. 66:21-24.

[236] Tr. 69:18-25; 70:1-5.

[237] Gov. Exhibit 1 at 9:24:40.

[238] Tr. 70:23-25; Tr. 71:1-16.

[239] Tr. 71:21-25.

[240] Tr. 73:8-22; Tr. 96:8-15; 169:18-24; Gov. Exhibit 2 at 9:26:45.

after Deputy Peterson told Trooper Gibbs that the canine had alerted on the vehicle, dispatch got on the radio and stated that they had the records check back on Frazier.[241]

At approximately 9:27 a.m., dispatch told Trooper Gibbs that Frazier did not have any criminal history since 2006, but he had been charged with murder and pled to manslaughter.[242] Based on that information, Trooper Gibbs decided to place Frazier in the back of his patrol car while they conducted the vehicle search.[243]

Throughout the entire contact from the stop to the canine alert, Trooper Gibbs was not only pursuing tasks associated with a routine traffic stop, he was making observations and assessing the facts that formed reasonable suspicion that Frazier was engaged in criminal activity. Although the duration and scope of the traffic stop was not longer than reasonably necessary to effect the original purpose of the stop, Trooper Gibbs had reasonable suspicion to extend the duration and scope of the stop to include the canine sniff if necessary. A traffic stop may be expanded beyond its initial purpose if the officer has reasonable suspicion that illegal activity is occurring.[244] "Officers with reasonable suspicion to believe that the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle for a reasonable time to obtain a properly trained dog to sniff for contraband."[245] An officer is "entitled to make an assessment of [a] situation in light of his specialized training."[246]

---

[241] Tr. 74:13-25; 75:1-6; Gov. Exhibit 2 at 9:26:55.

[242] Tr. 75:19-25; 76:1; Gov. Exhibit 2 at 9:26:55-9:27:36 [dispatch also notified Trooper Gibbs that the Defendant had served seven years for involuntary manslaughter].

[243] Tr. 76:10-23.

[244] *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015).

[245] *United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006); *see also United States v. Villa-Chaparro*, 115 F.3d 797, 802-03 (10th Cir. 1997) (finding 38-minute wait for arrival of canine reasonable where defendant failed to pull over promptly or prove he could lawfully operate the vehicle and masking agent observed in vehicle).

[246] *Arvizu*, 534 U.S. at 276; *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003).

Trooper Gibbs made his assessments in light of his specialized training and experience. Trooper Gibbs has been a Utah Highway Patrol Trooper for more than seven years,[247] and has received specialized training with regard to interdiction, including a three-day national training in 2016 and numerous trainings that have specialized in interdiction.[248] Trooper Gibbs is a member of an interdiction team specializing in enforcement and interdiction projects.[249] He is trained to look for reactions to his presence, along with different indicators and small differences when conducting traffic stops, which may not be apparent to someone who does not have his training and experience.[250] Trooper Gibbs averages approximately 1,000 traffic stops a year for the Utah Highway Patrol, and spends most of his shift patrolling Interstate 15,[251] a major highway utilized for drug trafficking in the United States in which drugs typically flow north from the southwest.[252] Trooper Gibbs is trained to look for small details to not only look for criminal activity but to also ensure his safety.[253]

Trooper Gibbs' training and experience in drug interdiction plays a role in his assessment of reasonable suspicion in this case. The assessment of reasonable suspicion is based on the totality of the circumstances, and a court may not avoid a conclusion of reasonable suspicion by undertaking a "divide-and-conquer analysis" in which it examines factors "in isolation from each

---

[247] Tr. 6:19-21.

[248] Tr. 7:11-20.

[249] Tr. 8:9-16; 14:21-25.

[250] Tr. 9:14-25; 10:1-2.

[251] Tr. 11:4-8; 11:23-25 – 12:1.

[252] Tr. 11:16-20.

[253] Tr. 13:9-23.

other," and may not discard a factor merely because it is "readily susceptible to an innocent explanation."[254]

Prior to Bolos' alert to narcotics in the vehicle, Trooper Gibbs observed many factors which, based on his training an experience, and when considered in totality, gave rise to reasonable suspicion of criminal activity. As cited previously, some of the key facts and observations that led to reasonable suspicion include, but are not limited to:

- Trooper Gibbs observed a duffle bag in the cargo area of the vehicle;

- Frazier would not roll down the window more than a few inches;

- Trooper Gibbs observed an air freshener or deodorizer in the vehicle;

- Trooper Gibbs believed that Frazier was being deceptive when answering his routine questions;

- Frazier had identification documents from two states in his wallet;

- Frazier could not produce a rental agreement to establish his authority to operate the vehicle;

- The travel pattern of Frazier, to Los Angeles and back, including the short turnaround time for the trip.

Unusual behavior, coupled with other factors, supports reasonable suspicion.[255] Based on his training and experience, Trooper Gibbs believed that some of Frazier's conduct was unusual and suspicious. Among the many factors that contribute to reasonable suspicion, "the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many [ ] cases upholding further questioning."[256] The "defining characteristic" of the 10th Circuit's

---

[254] *Arvizu,* 534 U.S. at 274.

[255] *See United States v. Villasenor*, 608 F.3d 467, 473 (9th Cir. 2010) (finding smuggler's tip and defendant's unusual behavior after border crossing enough to provide reasonable suspicion to search car at border); *United States v. Soares*, 521 F.3d 117, 120-21 (1st Cir. 2008) (holding time of night, unusual behavior, and use of profanity yielded reasonable suspicion); *United States v. Romain*, 393 F.3d 63, 72 (1st Cir. 2004) (holding combination of 911call and defendant's visible agitation and belligerence resulted in reasonable suspicion).

[256] *United States v. Hunnicut*, 135 F.3d 1345, 1349 (10th Cir. 1998).

"traffic stop jurisprudence" is one's lack of indicia of proof to lawfully operate or possess the vehicle, thus giving rise to reasonable suspicion that the vehicle may be stolen.[257] Frazier was unable to provide sufficient proof that he was authorized to operate the vehicle, which contributes to reasonable suspicion. That issue was not resolved until Trooper Gibbs called the rental company himself, as Frazier was never able to produce a rental agreement.

While there may be innocent explanations for each observation, the "existence of a plausible innocent explanation does not preclude a finding of reasonable suspicion. 'Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances.'"[258] Given the totality of the above-described factors, Trooper Gibbs had reasonable suspicion to prolong the detention of Frazier to the moment that Bolos alerted on the vehicle.

## III.    Probable Cause Existed to Search Frazier's Vehicle.

A trained canine's alert to the scent of narcotics in a vehicle establishes probable cause to search the vehicle.[259] Bolos, a trained canine, alerted to narcotics in Frazier's vehicle, establishing probable cause to search the vehicle.[260] Deputy Peterson has been an Iron County Sheriff's Deputy for eight years, and has been a trained canine handler for more than five years.[261] Bolos was certified as a narcotics detector dog with Deputy Peterson in 2016, and has been re-certified each year as required.[262] Bolos' most recent certification, which was active at

---

[257] *United States v. Fernandez,* 18 F.3d 874, 879 (10th Cir. 1994).

[258] *United States v. Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015) (citation omitted).

[259] *Florida v. Harris*, 568 U.S. 237 (2013).

[260] Tr. 165:11-25; 166:12-25; 167:1-6; 168:14-21.

[261] Tr. 150:17-21; 151:21-24; 152:15-17.

[262] Tr. 153:15-24.

the time of Frazier's traffic stop, was issued on March 29, 2019.[263] Bolos is trained to detect methamphetamine, heroin, cocaine, and marijuana.[264]

Deputy Peterson began deploying Bolos around Frazier's vehicle at approximately 9:24 a.m.[265] Bolos conducted the "free-air sniff" of the vehicle, making three passes around the vehicle in both directions, clockwise and then counterclockwise, consistent with his training.[266] Bolos alerted on the back of the vehicle by going up on it and sniffing around, but Bolos provided a more pronounced alert at the driver's side door, pressing hard on the door seam.[267] At approximately 9:26 a.m., Deputy Peterson notified Trooper Gibbs that Bolos had alerted to narcotics in the vehicle at the "driver's door."[268] Bolos' alert provided probable cause to search Frazier's vehicle.[269]

---

[263] Tr. 157:4-25; 158:1-2; Government's Exhibit 6, docket no. 22, filed March 4, 2020 (Certification Record for K-9 Bolos).

[264] Tr. 156:8-10.

[265] Gov. Exhibit 1 at 9:24:40.

[266] Tr. 158:9-25; 165:1-10; 166:15-25.

[267] Tr. 165:11-25; 166:12-25; 167:1-6; 168:14-21.

[268] Tr. 73:8-22; Tr. 96:8-15; 169:18-24; Gov. Exhibit 2 at 9:26:45.

[269] *See Caballes*, 543 U.S. 405 (2005).

## ORDER

Trooper Gibbs had reasonable suspicion to stop Frazier's vehicle for several observed traffic violations; the detention of Frazier did not exceed that which is legally authorized under the circumstances; and there was probable cause to search Frazier's vehicle based upon a trained canine alert. Accordingly, the Motion is DENIED.

Signed June 13, 2020.

BY THE COURT

David Nuffer
United States District Judge